## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

JASEN HUNTER, SHALITA HUNTER, NOAH HUNTER, and MILLIONAIRE PORTFOLIO GROUP, LLC

      Plaintiffs,

vs.

OPAL TOWERS WEST CONDOMINIUM ASSOCIATION, INC. and ELIZABETH SESSA,

      Defendants.

**CASE NO.: 0:21-cv-60603**

## COMPLAINT

Plaintiffs, Jasen Hunter ("Mr. Hunter"), Shalita Hunter ("Mrs. Hunter") (Mr. and Mrs. Hunter are the "Hunters"), and Noah Hunter ("Noah Hunter") (collectively, Mr. Hunter, Mrs. Hunter, and Noah Hunter are the "Plaintiffs"), hereby sue Defendants, Opal Towers West Condominium Association, Inc., ("Opal Towers West" or "Association"), and Elizabeth Sessa, and allege as follows:

## NATURE OF ACTION

1.    This is a civil action for injunctive relief, other equitable relief, and damages, including actual, compensatory, and punitive damages, for violations under the Federal Fair Housing Act ("FFHA"), 42 U.S.C. § 3601, *et seq*., the Federal Equal Rights Act ("FERA"), 42 U.S.C. § 1981, *et seq*., the Florida Fair Housing Act ("Florida FHA"), § 760.20, *et. seq*. Florida Statutes, the Florida Condominium Act ("FCA"), § 718.101, *et seq*., Florida Statutes, and the Florida Consumer Collection Practices Act ("FCCPA"), § 559.55, *et seq*.

2.     Under the direction of its president, Elizabeth Sessa ("President Sessa" or "Sessa"), Opal Towers West has engaged in repeated and widespread campaign to foment a hostile housing environment with the express purpose of denying an African American family their right to enjoy the fruits of their labor and live peacefully in their home.

## PARTIES

3.     Mr. and Mrs. Hunter and Noah Hunter are Association approved residents of the Opal Towers West Condominium building located in Broward County, Florida, and, as African Americans, are members of a protected class.

4.     Opal Towers West is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business located in Broward County, Florida.

5.     Elizabeth Sessa is an individual, *sui juris*, and a resident of Broward County, Florida.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C § 1331; 28 U.S.C. §§ 2201 and 2203; and 28 U.S.C § 1367 (supplemental jurisdiction), because this action involves one or more federal questions, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

8.     The events that make up this cause of action concern the residential condominium apartment, number 812, located at 1150 Hillsboro Mile, Hillsboro Beach, FL 33062 ("Residence" or the "Unit").

9.      The Residence is located in the western tower of the waterfront condominium development known as Opal Towers ("Condominium Property" or "Development").

10.     The Condominium Property boasts amenities, including, but not limited to, a pool, beach access, gym, activity room, sauna, billiard room, card rooms, community room, recreation room, library, and garage with assigned parking spaces ("Condominium Amenities").

11.     Opal Towers West was created as the governing the condominium association by that certain Declaration of Condominium ("Opal Towers Declaration") dated February 6, 1974, and recorded on February 7, 1974, in Official Records Book 5632, at Page 762 of the public records of Broward County, Florida; as amended by that certain Amended Declaration of Condominium of Opal Towers West, a Condominium ("Amended Opal Towers Declaration"), dated February 2, 2016, and recorded on March 2, 2016, as Instrument No. 113547944 of the public records of Broward County, Florida.

12.     Opal Towers West, in accordance with the laws governing Florida condominium associations, annually elects a board of directors ("Board") along with officers such as President, Vice President, Secretary, and Treasurer.

13.     The Board is constituted to make decisions on behalf of the condominium unit owners as a whole. The Board is not established to manage the day-to-day operations of the Condominium Property.

14.     Instead, the Condominium Property is supposed to be managed by a professional property management company that is contracted with by the Board.

15.     Prior to 2019, Opal Towers West was managed by Diana Zayas-Bazan.

16.     Since 2019, the Condominium Property has been managed by Castle Group Management, Inc. *d/b/a* Castle Group ("Castle Group" or the "Management Company").

17.     Mr. and Mrs. Hunter purchased the Residence on January 5, 2018 via public auction held in connection with a foreclosure action brought by Opal Towers West.

18.     Although they used Millionaire Portfolio Group, LLC ("MPG") to bid on the Unit at the foreclosure sale and take title to the Residence, Mr. and Mrs. Hunter are the equitable and beneficial owners of the Residence.

19.     On January 22, 2018, Mr. and Mrs. Hunter submitted to the Association an *Application for Purchase/Lease and Screening Procedures* ("Application") seeking formal approval for MPG's acquisition of the Residence.

20.     As set forth within the Application, Jason Hunter, Shalita Hunter, as well as their children, Noah, Micah ("Micah"), and Queen ("Queen") (collectively, the "Hunter Family"), were all identified as prospective residents and invitees of MPG.

21.     On January 23, 2018, the Association approved the Hunter Family as residents of Opal Towers.

22.     On or about February 17, 2018 the Hunter Family moved into and began living in the Residence.

23.     Upon their arrival at Opal Towers West, Sessa revealed that she harbored a racial animus toward the Hunter Family when she remarked to fellow residents that "she didn't pay almost a half of million for her condo to share common areas with n****rs."

24.     Sessa's racist pronouncement, combined with the heated demeanor she delivered it, caused those that heard it to conclude that if and when Sessa was elected to the Board, she would use her position to expel the Hunter Family from Opal Towers West.

25.     In or around July of 2018, Sessa was elected to the Opal West Association Board of Directors ("Board") and elevated to the Office of Secretary.

26.     Prior to Sessa's election, the Hunter Family resided in the Unit uneventfully.

27.     Once Sessa was elected to the Board, she exploited her position to commence a campaign of harassment aimed at the Hunter Family.

28.     The month after her election, on August 11, 2018 to be exact, Sessa accosted Mrs. Hunter in the garage while she was attempting to park her car.

29.     Sessa, unknown to Mrs. Hunter at the time, did not identify herself as a member of the Board.

30.     Nevertheless, Sessa peppered Mrs. Hunter with questions and accused her, falsely, of violating Association parking rules.

31.     In addition to acting in a generally uncivil manner, Sessa's behavior and words and actions betrayed a deep and unwarranted personal animus. For example:

        a.      Sessa used her body to prevent Mrs. Hunter from exiting her vehicle.

        b.      Sessa thrust her phone through Mrs. Hunter's driver side window, screaming, "it's these people!"

32.     Sessa's demeanor was so loud and aggressive Mrs. Hunter feared for her safety.

33.     Based on Sessa's hostile actions, Mrs. Hunter called the police for protection.

34.     The incident was so upsetting that Mrs. Hunter felt compelled to notify the Board on October 23, 2018 that all future contact regarding Association related matters should be communicated through building management by email or in writing.

35.     Although Mrs. Hunter's message allowed for emergency contacts by phone, she expressly demanded that the Board not send anyone to knock on her door unless by appointment.

36.     In spite of Mrs. Hunter's plea to limit non-emergency contacts, between August of 2018 and May of 2019, Sessa used her position on the Board to harass the Hunter Family by

directing the Development's building security personnel or maintenance staff, on at least twenty (20) occasions, to call or knock on the Hunter Family's door.

37.     These contacts were unwelcome, unwarranted, and distressing.

38.     On December 3, 2018, Sessa used her office on the Board, wrongfully, to cause a vehicle restriction device known as a "boot" to be placed on Mrs. Hunter's vehicle.

39.     Although the justification of Sessa's actions was purportedly based on the fact that Mrs. Hunter's vehicle was blocking access to a loading area, the use of a boot prevented the vehicle from being moved, thereby prolonging the supposed problem.

40.     Upon information and belief, Sessa directed a boot be used solely to harass and inconvenience Mrs. Hunter.

41.     Upon attempting to use her car following the removal of the wrongfully applied boot, one of the tires on Mrs. Hunter's vehicle was punctured by a large screw that was deliberately placed in such a manner that it was certain to penetrate the vehicle's tire.

42.     Upon information and belief, Sessa caused the screw to be placed under Mrs. Hunter's vehicle tire.

43.     In January of 2019, Sessa used her vehicle to stalk and frighten Mrs. Hunter's eldest son, Noah, by approaching him from behind while he was walking in the garage of the Condominium Development.

44.     Despite the fact that he was not blocking any right of way, Sessa, once in close proximity with Noah, activating her vehicle's horn for a prolonged interval, startling him.

45.     In or around February of 2019, Sessa was elevated to the office of President of the Association.

46.     In March of 2019, Mrs. Hunter communicated to Castle Group her deep resentment of Sessa's constant abuse of her position as President of the Association.

47.     Mrs. Hunter's email to Regina Patterson ("Ms. Patterson"), the property manager representing Castle Group, conveyed several important messages.

a.     First, Mrs. Hunter put Ms. Patterson on notice of her prior (2018) communication to the Association Board insisting that all non-emergency communications to her be made in writing via email or mail.

b.     Second, on multiple occasions since Mrs. Hunter's written demand to limit the manner and means of non-emergency contacts from Board Officers and building management, Sessa used her position as President of the Association to order security staff to contact her directly by phone or knock on her door for non-emergency related matters.

c.     Third, that Sessa's constant contacts with Mrs. Hunter and her family members were a misuse of her powers as President of the Board and contrary to Castle Group's responsibilities as Manager of the Condominium Development.

d.     Fourth, that Mrs. Hunter was "concerned" about the effects that Sessa's constant "harassment," and "bullying" was having on herself, her family, and the larger community of residents of Opal Towers West.

48.     During the summer of 2019, a period during which Sessa was absent from the Development, the Hunter Family experienced no harassment or enforcement incidents.

49.     Immediately upon Sessa's return, however, the Hunter Family's peaceful enjoyment of their home was shattered.

50.     During the final week of September, Noah was reported to the police as a possible threat to the residents of Opal Towers West.

51.    According to the anonymous female caller, Noah was lurking in the community room, smoking "bad things," and causing female residents using the gym and the nearby pool "to be afraid."

52.    Two units of the Hillsboro Beach Police Department were dispatched.

53.    Although the responding officers found Noah just sitting in the community room doing his homework on his laptop, the threat to Noah (as opposed to the falsified threat reported by Sessa) was real.

54.    Police violence is a leading cause of death for young black men in the United States.

55.    About 1 in every 1,000 black men can expect to be killed by police. Black men are about 2.5 times more likely to be killed by police over the life course than are white men. (Source: https://www.pnas.org/content/116/34/16793).

56.    Violent encounters with the police have profound effects on health and life chances of African American men.

57.    Not long thereafter, Sessa used her position on the Board to fashion new "Community Room Guidelines." According to these "Guidelines," computers, like the laptop Noah used to do his homework, were banned from the Community Room.

58.    In October of 2019, Sessa's harassment continued.

59.    On October 7, 2019, Sessa dispatched a security officer to tell Mrs. Hunter that "she [Sessa] does not want you parking in front of the building."

60.    On October 9, 2019, Sessa confronted Mrs. Hunter in the community room. Sessa stated that she "does not like and does not want" the Hunter Family to use laptop computers in the community room. No such rule or regulation, however, was ever enacted by the Board.

61.     Shortly after this incident, when other residents of Opal Towers West inquired with Sessa about whether the new Guidelines were issued because the Hunters were black, Sessa's true animus toward the Hunter Family was again laid bare.

62.     Sessa stated, "I don't want them using their laptops to conduct business here. They are running a Ponzi scheme."

63.     Sessa went on to smear Mr. Hunter, a United States Air Force veteran, as a "bank robber" and the Hunter Family as "squatters."

64.     Sessa then admitted that her goal was to "get them out."

65.     On October 10, 2019, Sessa, while presiding over a meeting of the Board, moved to impose parking fines on the Hunter Family in connection with Mr. Hunter's pick-up truck, a 2009 Nissan Titan 5.6 LE ("Nissan").

66.     On October 25, 2019, the Hunter Family received a letter ("Open Truck Letter") from the Board notifying them of a $100.00 a day fine, "for each violation."

67.     According to the Open Truck Letter, the Hunters were subject to the fine because Mr. Hunter's truck was considered an "open truck," which was prohibited from being parked on the premises.

68.     Although the Opal Towers West Rules and Regulations (applicable May 17, 2019) lists "open trucks" in connection with those vehicles that are prohibited from being parked on the premises, that term is not defined anywhere in the Rules or the Amended Declaration.

69.     In addition to being undefined, the term "open trucks" is overly broad and ambiguous.

70.     Further, the term is capricious where a classification regime is readily available based on gross vehicle weight rating or, alternatively, the Federal Highway Administration truck

classification system.

71.    The Opal Towers West By-Laws, however, are explicit and unambiguous.

72.    The By-Laws, which govern over any rules promulgated thereunder, permit parking of passenger pick-up trucks by exclusively prohibiting "SIGNED trucks OR TRUCKS LARGER THAN A PASSENGER PICKUP" only.

73.    Mr. Hunter's Nissan qualifies as a class 2b light/medium passenger pickup truck.

74.    Similar passenger pickup trucks, of the open variety, have been parked by residents of Opal Towers West for many years.

75.    On November 5, 2019, Mr. and Mrs. Hunter attended a grievance meeting in the management concerning fines imposes by the Association in connection with Mr. Hunter's Nissan.

76.    Ms. Patterson was present at that meeting, but for all intents and purposes, Sessa dictated what occurred at the meeting.

77.    By insinuating herself into the meeting, Sessa caused the Association to violate §718.303, Florida Statutes, which requires condominium associations to assemble a hearing committee of at least three members appointed by the board who are **not** officers, directors, or employees of the association, or the spouse, parent, child, brother, or sister of an officer, director, or employee.

78.    Rather than due process, Sessa's agenda for the meeting was to harass and intimidate Mr. and Mrs. Hunter.

79.    Sessa announced her true goals with a threat, yelling for all to hear, "I am coming for you."

80.    Sessa continued, "You people don't belong here and I am going to get you out."

81.     Due to Sessa's unlawful and improper control of the meeting, Mr. and Mrs. Hunter were denied the due process required by Florida law and any chance of reaching a fair determination was lost.

82.     Notwithstanding Sessa's sabotage of the due process that the grievance meeting was meant to provide, Opal Towers still issued a written determination upholding the disputed fines and demanded payment in full.

83.     Between November 26, 2019 and November 26, 2019, the Association levied $600.00 in fines for violations of the invalid Open Truck rule. These fines are supposedly justified by six (6) violations of the Open Truck rule.

84.     Consequent to that, the Association imposed on the Hunters' OTW Account $1,200.00 in additional fines and charges related to the same alleged violations, bringing the Open Truck rule related fines and charges to $1,800.00 ("Open Truck Parking Fines and Fees").

85.     Pursuant to § 718.303(3), a fine may not exceed $100 per violation, or $1,000 in the aggregate.

86.     The Association's Parking Fines and Fees represent a three-fold fine for the same alleged violation, the aggregate of which exceeds the $1,000.00 cap imposed by § 718.303(3).

87.     The Open Truck Parking Fines and Fees therefore constitute a violation of section 718.303(3), Florida Statutes.

88.     On November 9, 2019, Sessa directed building security to the community room where Mr. Hunter was using his laptop, to demand that he leave or be contacted by Sessa.

89.     Shortly after Mr. Hunter declined to leave, Sessa entered the community room and confronted Mr. Hunter.

90.     In a bid to intimidate him, Sessa invaded Mr. Hunter's personal space, touched his belongings, raised her voice, used inappropriate language, and banged on the table at which he was seated.

91.     Another notable incident occurred on January 12, 2020.

92.     On that date, Noah parked his car in the 1-hour parking space directly in front of the building. Upon entering the building, Noah informed security that he would be returning to his vehicle momentarily.

93.     Nevertheless, mere minutes later, Mrs. Hunter received a phone call from the security desk.

94.     According to the security officer, Sessa directed him to call Ms. Hunter and demand that Noah move his vehicle because "she doesn't want it there."

95.     Mrs. Hunter stopped what she was doing and went downstairs to address the latest source of harassment.

96.     Upon arriving in the lobby, Mrs. Hunter was immediately confronted by Sessa, who was loitering near the security desk and micromanaging the security officer.

97.     Sessa stated loudly and in a threatening manner, "I'm working on getting you out of here. You don't belong here. You are not owners. You are squatters! It won't be long."

98.     Sessa's haranguing continued even after Mr. Hunter arrived on the scene.

99.     Sessa called the Hunter Family "filthy animals."

100.     Sessa then directed the security to "get them out of here."

101.     Sessa became so disorderly and threatening that Mr. Hunter called for police assistance.

102.    Later that same day, around 7 p.m., Sessa followed Noah on the Development grounds and accosted him aggressively about parking and using of common areas in the building.

103.    Sessa's campaign of harassment also included attempts to exploit the Association's powers as assessor of dues and fees.

104.    As of February 1, 2019, the Hunters' owed $0.00 in assessments or fees to Opal Towers West and no fines had been imposed.

105.    On February 28, 2019, not long after Sessa was elevated to the office of president of Opal Towers West, an undue balance of $49.02 ("Undue Balance") was charged to the Hunters' Opal Tower's West account ("OTW Account").

106.    On July 9, 2019, Mrs. Hunter timely remitted payment in satisfaction of her third quarter assessment. Unbeknownst to the Hunters, the Undue Balance remained on their OTW Account.

107.    On July 10, 2019, the Association added to the Undue Balance a late fee and administration charge totaling $45.00.

108.    In August and September of 2019, the Undue Balance, now standing at $94.02, was used by the Association to justify additional administration charges totaling $80.00. By October 1, 2019, the Hunters' OTW Account stood at $174.02 in unjustified charges and fees.

109.    On October 1, 2019, Mrs. Hunter remitted a check to Opal Towers West for $1,372.00 in timely and full satisfaction of the Association's 2019 fourth quarter assessment.

110.    Between October 1 and December 31 of 2019, the Association imposed an additional $145.00 in late fees and administrative charges, bringing the total amount of the Undue Balance to $259.02.

111.    These additional fees and charges were unjustified because the Hunter's third-quarter assessment was timely paid.

112.    On January 29, 2020, via a letter ("Lien Threat Letter") from its lawyers, the Association threatened Mr. and Mrs. Hunter with filing a "Claim of Lien" against their Residence if they did not pay $759.02 ("Purported Debt").

113.    The Purported Debt includes the Undue Balance of $259.02, plus fresh late fees, administrative charges and a demand for $280.00 compensate the attorney for writing the Lien Threat Letter.

114.    None of the amounts demanded, however, were legitimately owed. All of these charges and fees were based on the original, unwarranted balance of $49.02.

115.    The Association used the Undue Balance to justify a series of additional late fees and late letter administration fees that further inflated, falsely, the Purported Debt.

116.    On February 25, 2020, Regina Patterson, on behalf of Opal Towers West, transmitted an email to Mrs. Hunter containing what was called a "FORMAL NOTICE OF SUSPENSION OF THE RIGHT TO USE THE COMMON AREAS, COMMON FACILITIES AND ASSOCIATION PROPERTY AND NOTICE OF SUSPENSION OF VOTING RIGHTS." ("Suspension Notice").

117.    Per the Suspension Notice, as of Monday, February 24, 2020, the Hunters were more than ninety (90) days delinquent in the payment of a monetary obligation to the Association.  Although the Suspension Notice fails to identify the specific monetary obligation relied upon, the ninety-day timeframe includes amounts that were not legitimately owed by the Hunters, including the Purported Debt.

118.    Notwithstanding the its lack of justification for the Suspension Notice, the Association suspended the Hunter Family's right to "use any of the common areas or common

facilities, including, but not limited to, your right to use the Laundry Rooms, Fitness Center, Swimming Pool, Spa, BBQ Grills, Community Room, Bike Room, Beach Access and Computer Room."

119.    Additionally, the Suspension Notice states that the Hunter's voting rights, as owners of the Unit, would be suspended within thirty (30) days.

120.    On February 27, 2020, Mrs. Hunter transmitted a lengthy email ("Dispute") disputing the Purported Debt to Danielle Riggin, a paralegal that worked for the law firm responsible for the Lien Threat Letter.

121.    As set forth in Mrs. Hunter's Dispute Letter, and as supported by the records attached, no assessment fees were owed.

122.    On March 18, 2020, via a letter ("False Lien Letter") from its lawyers, the Association notified Mr. and Mrs. Hunter that a "Claim of Lien" had been filed against their Residence because they had not paid $1,082.52 ("False Indebtedness") in supposedly past-due assessments, administration fees, late fees, mail charges, legal expenses, and "other" unidentified costs.

123.    The False Lien Letter was an unlawful attempt to collect a debt that was legitimately owed.    Further, the False Lien Letter asserted the existence of a legal right (recordation of a lien) when the Association knew or should have known that the right to lien the Hunter's Residence did not exist.

124.    On March 26, 2020, the Claim of Lien was recorded in the public records of Broward County, Florida as Instrument No. 116432945 ("Unlawful Claim of Lien").

125.    The Unlawful Claim of Lien remained of record until December 15, 2020.

126.    The Unlawful Claim of Lien did not go unnoticed.

127.     During the summer of 2020, Mrs. Hunter sought bids from local contractors to perform repairs on the Residence, which work was specifically requested by the Association.

128.     In connection with her efforts to expedite the repairs, Mrs. Hunter applied for financing through Renew Financial Group, LLC ("RFG").

129.     On July 13, 2020, RFG notified Mrs. Hunter that her application had been denied.

130.     Upon information and belief, RFG denied Mrs. Hunter's application due to the presence in the public record of the Unlawful Claim of Lien.

131.     The credit denial ultimately delayed the repairs, exacerbated the conditions which the Hunters sought to mitigate with timely repairs, and caused the Hunters to incur undue damages.

132.     On February 11, 2020, the Hunters' neighbor, Sandra Trimble ("Trimble"), communicated her permission to the Association for the Hunters to park Mrs. Hunters' 2005 Cadillac in her assigned parking space.

133.     On February 25, 2020, Sessa signed, as president of Opal Towers West, a document called Parking Amendment to the Rules and Regulation Passed at a Noticed Board of Directors Meeting Held Tuesday, February 25, 2020 ("Sessa Rule").

134.     According to the Sessa Rule, "[n]o parking space may be borrowed by a resident whose Unit is delinquent in the payment of any amount due to the Association."

135.     The Sessa Rule goes on to prohibit the unit owner from using any loaned space until the loan is rescinded and threatens fines against any unit owner that loans a parking space to a person who is ineligible to borrow a space under the new rules.

136.     Upon information and belief, the Sessa Rule was specifically enacted in response to Trimble's loan of her assigned space to the Hunters.

137.     Over the summer of 2020, Sessa used her position as president of the Association to threaten Trimble with fines and forced her to withdraw her permission to the Hunters to park in her assigned parking space.

138.     Sessa also caused Noah's car to be towed from the borrowed space on or about July 13, 2020.

139.     Sessa's action, in addition to being part of her campaign of discrimination, was unjustified because, as described above, the Hunter's did not owe the amounts claimed by the Association.

140.     On Sunday, May 10, 2020, Mother's Day, Mrs. Hunter, joined by members of her family, including her minor daughter, were accosted by a group led by Sessa.

141.     As they walked along path provided for Opal Towers West residents and guests to access the beach, members of Mrs. Hunter's family were stopped and interrogated by Sessa and her husband, Jason R. Sessa ("Ralph Sessa").

142.     As the confrontation escalated, Ralph Sessa was head to say, unprovoked, "Don't pull that black card shit."

143.     The incident was so distressing, a member of Mrs. Hunter's family became frightened for her safety and fled the scene.

144.     Sessa used her authority as president of the Association to block Mrs. Hunter from enjoying a facet of the amenities that residents of Opal Towers West are entitled to.

145.     On October 18, 2020, Mrs. Hunter was again approached by a member of the Development's security upon exited her vehicle. The security officer told Mrs. Hunter, "Elizabeth told me to come out here. She said she does not want you parking in this spot."

146.    On December 11, 2020, Danielle Riggin, on behalf of the Association, finally responded to Mrs. Hunter's Dispute, writing "I reviewed the file and we will be recoding a Satisfaction of the lien. The file is closed with our office."

147.    On December 15, 2020, a Release of Condominium Lien was recorded by Backer Aboud Polikoff & Foelster in the public records of Broward County as Instrument # 116928327.

148.    Upon information and belief, as recently as January of 2021, the Association authorized unknown parties to use the Hunter's assigned parking space for storage purposes, as well as to park cars, all in violation of Association rules.

149.    The above history constitutes only a partial retelling of all of the discriminatory abuse suffered by the Hunter Family due to Sessa's actions while serving on the Board of the Association.

150.    As a result of Sessa's campaign of discriminatory harassment, the Hunters have suffered tremendously.

151.    Rather than be a place of respite, each time Mrs. Hunter arrived at her Residence she felt dread contemplating the next confrontation with Sessa.

152.    Mrs. Hunter was even forced to leave her home for two weeks in order to alleviate the stress. Mrs. Hunter has lost productivity because she works from home.

153.    The emotional stress Mrs. Hunter experienced also caused her loss of sleep for a consecutive days over a three week period.

154.    Mr. Hunter has experienced emotional distress in the form of disturbed sleep, headaches, fatigue, loss of concentration and diminished productivity.

155.    Noah Hunter has experienced emotional distress in the form of mental anguish and embarrassment.

156.     The Hunters have incurred out-of-pocket monetary damages, including, but not limited to, towing costs, pest control services, repair damage costs, etc.

## COUNT I
## VIOLATIONS OF FEDERAL FAIR HOUSING ACT

157.     Plaintiffs restate and realleges paragraphs 1 to 156 above as if fully set forth herein.

158.     It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

159.     Pursuant to Federal policy, § 3604 of the Fair Housing Act makes it is unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

160.     It is also unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by §§ 3603, 3604, 3605, and 3606 of the Federal Fair Housing Act.

161.     The acts complained of above constitute discriminatory housing practices that are in violation of § 3604(b) and § 3617 of the Fair Housing Act.

162.     The above-described acts constitute a continuing discriminatory pattern involving a continuing injury to Plaintiffs' attributable to the Association's denial to the Hunter Family of the privileges of sale and of services and/or facilities in connection therewith.

163.     Plaintiffs are aggrieved persons for the purposes of the civil remedies provision of the Federal Fair Housing Act.

164.     The Residence is a dwelling, as defined by the Fair Housing Act.

165.    As a result of the Association's discriminatory acts, Plaintiffs have suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life, thereby entitling them to compensatory damages.

WHEREFORE, Plaintiffs' demand actual damages, compensatory damage, including emotional distress damages, punitive damages, and any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate, as well as a prevailing party attorneys' fees and costs under the FFHA.

**COUNT II**
**VIOLATIONS OF FLORIDA'S FAIR HOUSING ACT**

166.    Plaintiffs restates and realleges paragraphs 1 to 156 above as if fully set forth herein.

167.    It is the policy of the state of Florida to provide, within constitutional limitations, for fair housing throughout the state.

168.    Pursuant to Florida state policy, section 760.23, Florida Statutes, makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, national origin, sex, disability, familial status, or religion.

169.    It is unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise of, or on account of her or his having exercised, or on account of her or his having aided or encouraged any other person in the exercise of any right granted under §§ 760.20-760.37, Florida Statutes.

170.    The acts complained of above constitute discriminatory housing practices that are in violation of §§ 760.23 and 760.37 of the Florida Federal Housing Act.

171.    The above-described acts constitute a continuing discriminatory pattern involving a continuing injury to Plaintiffs' attributable to the Association's denial to the Hunter Family of the privileges of sale and of services and/or facilities in connection therewith.

172.    Plaintiffs are aggrieved persons for the purposes of the civil remedies provision of the Florida Fair Housing Act.

173.    The Residence is a dwelling, as defined by the Florida Fair Housing Act.

174.    As a result of the Association's discriminatory acts, Plaintiffs have suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life, thereby entitling them to compensatory damages.

WHEREFORE, Plaintiffs' demand actual damages, compensatory damage, including emotional distress damages, punitive damages, and any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate, as well as a prevailing party attorneys' fee and costs under the Florida Fair Housing Act.

## COUNT III
## VIOLATION OF 42 U.S.C. § 1981 - EQUAL RIGHTS UNDER LAW

175.    Plaintiffs restate and realleges paragraphs 1 to 156 above as if fully set forth herein.

176.    It is the law of the United States that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

177.    The Association discriminated against Plaintiffs in violation of the rights afforded Plaintiff's by the Civil Rights Act 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

178.    By the conduct described above, the Association intentionally deprived Plaintiffs of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their housing covenant with the Association, in violation of 42 U.S.C. §1981.

179.    By the conduct described above, the Association intentionally deprived Plaintiffs of the same rights as are enjoyed by white citizens to the performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

180.    As a result of the Association's discrimination in violation of Section 1981, Plaintiffs have been denied the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, thereby entitling them to injunctive and equitable monetary relief; and have suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of the Association's actions, thereby entitling them to compensatory damages.

181.    In its discriminatory actions as alleged above, the Association has acted with malice or reckless indifference to the rights of the Plaintiffs, thereby entitling them to an award of punitive damages.

182.    To remedy the violations of the rights of Plaintiffs secured by Section 1981, Plaintiffs request that the Court award them the relief prayed for below.

WHEREFORE, Plaintiffs' demand actual damages, compensatory damage, including emotional distress damages, punitive damages, and any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate, as well as a prevailing party attorneys' fee and costs under law.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1982 – EQUAL PROPERTY RIGHTS UNDER LAW**

183.    Plaintiffs restate and reallege paragraphs 1 to 156 above as if fully set forth herein.

184.    It is the law of the United States that all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

185.    By the conduct described above, the Association intentionally deprived Plaintiffs of the same rights as are enjoyed by white citizens to inherit, purchase, lease, sell, hold, and convey real and personal property.

186.    As a result of the Association's discrimination in violation of Section 1981, Plaintiffs have been denied the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, thereby entitling them to injunctive and equitable monetary relief; and have suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of the Association's actions, thereby entitling them to compensatory damages.

WHEREFORE, Plaintiffs' demand actual damages, compensatory damages, punitive damages, and any permanent or temporary injunction, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate, as well as a prevailing party attorneys' fee and costs under law.

**COUNT V**
**VIOLATION OF FLORIDA'S CONDOMINIUM ACT**
(AGAINST THE ASSOCIATION AND SESSA)

187.     Plaintiffs restate and reallege paragraphs 1 to 156 above as if fully set forth herein.

188.     Every condominium created and existing in the state of Florida is subject to the provisions of Chapter 718, known as the Condominium Act.

189.     The Association is a condominium association for the purposes of Florida's Condominium Act.

190.     Pursuant to Florida's Condominium Act, each unit owner, each tenant and other invitee, and each association is governed by, and must comply with the provisions of, Chapter 718, the declaration, the documents creating the association, and the association bylaws.

191.     The Association is subject to suit under Florida's Condominium Act with respect to the exercise or non-exercise of its powers.

192.     Sessa, as a director of the Association, is subject to suit under Florida's Condominium Act with respect to her willful and knowing failure to comply with the provisions of Chapter 718.

193.     Under Florida's Condominium Act, an officer, director, or agent of the association shall discharge his or her duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the interests of the association.

194.     Under the By-Laws, the authority granted to officers by virtue of their office must exercised in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the interests of the association.

195.     Under Florida's Condominium Act, the officers and directors of the association have a fiduciary relationship to the unit owners.

196.     Sessa breached her fiduciary duty of care to the Hunters by virtue of her bad faith, self-interest driven campaign against the Hunter Family.

197.     Sessa, as an officer, director, and/or agent of the Association, is liable for monetary damages by virtue of her reckless and/or bad faith acts or omissions, as well those actions taken by her with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

198.     The Association, under Florida's Condominium Act must comply with the Declaration and the Association Bylaws.

199.     Actions for damages or for injunctive relief, or both, for failure to comply with the provisions of Chapter 718 and the Condominium Documents may be brought by Hunters against the Association.

200.     The Association failed to comply with section 12.9 the Amended Opal Towers Declaration by promulgating an unreasonable regulation in the form of the Open Truck parking rule.

201.     The Open Truck parking rule is also invalid as it is an improper attempt to override section 12.7 of the Declaration, which permits parking of passenger pickup trucks.

202.     Further, the Association breached its duty to provide Mr. and Mrs. Hunter with an opportunity for a hearing before a committee of at least three members appointed by the board who are not officers, directors, or employees of the association, or the spouse, parent, child, brother, or sister of an officer, director, or employee.

203.   A fine or suspension levied by the board of administration may not be imposed unless the board first provides at least fourteen (14) days written notice to the unit owner and, if applicable, any occupant, licensee, or invitee of the unit owner sought to be fined or suspended.

204.   The Association violated Florida's Condominium Act by suspending Mr. and Mrs. Hunter's rights to use common elements, common facilities based on fees and/or fines that were imposed in contravention of Florida law.

WHEREFORE, Plaintiffs demand judgment in its favor on all Counts of this Amended Complaint and request a judgment awarding the following relief: (a) actual and compensatory damages; (b) declaration that the Open Truck parking rule is unenforceable; (c) injunction against Sessa from serving on the Board; (d) punitive and exemplary damages sufficient to deter Defendants from similar conduct in the future; (g) Plaintiffs' costs of this action, including Defendants' attorneys' fees; (h) prejudgment and post-judgment interest on all amounts awarded; and, (i) and such other and further relief as the Court may deem just and proper.

**COUNT VI**
**<u>VIOLATION OF FLORIDA CONSUMER COLLECTION PRACTICES ACT</u>**

205.   Plaintiffs restate and re-allege paragraphs 1 to 156 above as if fully set forth herein.

206.   The False Indebtedness and other disputed debts identified above, are consumer debts for the purposes of the Florida Consumer Collection Practices Act, § 559.55(6), Florida Statutes.

207.   The Hunters are consumers the purposes of the Florida Consumer Collection Practices Act, § 559.55(8), Florida Statutes.

208.   In furtherance of an attempt to collect consumer debts:

    a.  The Association committed a prohibited practice in violation of § 559.72(6), Florida Statutes, by recording the Claim of Lien in the public records of Broward,

which disclosed information concerning the existence of a debt the Association knew to be reasonably disputed by Mrs. Hunter, without disclosing that fact;

b.  The Association committed a prohibited practice in violation of § 559.72(9), Florida Statutes, by claiming, attempting, or threatening to enforce a debt when the Association knew that the debt was not legitimately owed.

c.  The Association committed a prohibited practice in violation of § 559.72(9), Florida Statutes, by asserting the existence of some other legal right when the Association knew that the right does not exist.

d.  The Association committed a prohibited practice in violation of § 559.72(9), Florida Statutes, by telling Mrs. Hunter that it would disclose to others in writing, directly or indirectly, information affecting the debtor's reputation for credit worthiness without also informing the debtor that the existence of the dispute will also be disclosed as required by § 559.72(6), Florida Statutes.

209.   As a result of the above, the Association is liable for actual damages and for additional statutory damages as the court may allow, together with court costs and reasonable attorney's fees incurred by the Hunters.

210.   The Hunters are also entitled to an award punitive damages and such other equitable relief as the Court may deem necessary or proper, including enjoining the Association from further violations of the Florida Consumer Collection Practices Act.

211.   The Hunters are represented by the undersigned counsel. The Hunters' counsel has incurred and will incur fees and costs in connection with pursuit of the Hunters legal rights, which fees and costs are reimbursable under § 559.77(2), Florida Statutes.

CASE NO.: 0:21-cv-60603

WHEREFORE, Plaintiffs demand judgment against Defendants for: (a) actual damages; (b) compensatory damages; (c) statutory damages; (d) punitive damages; (e) injunctive relief; (f) costs of suit; (g) attorneys' fees; (h) any such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demands a trial by jury on all issues so triable.

Respectfully submitted,                    Dated this ___18<u>th</u>___ day of March, 2021.

KRINZMAN, HUSS, LUBETSKY
    FELDMAN & HOTTE
169 E. Flagler Street, Suite 500
Miami, Florida 33131
Telephone:   (305) 854-9700
Facsimile:   (305) 854-0508
Primary email:     gna@khllaw.com
Secondary email: eservicemia@khllaw.com

By: _____
        George N. Andrews, Esquire
        Florida Bar No. 15885